# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ALUTECH UNITED, INC., )
                                         )
    Employer Below-Appellant, )    C.A. No. N21A-02-001 FWW
                                           )
          v. )
                                           )
MICHAEL SAMMONS, )
                                           )
    Claimant Below-Appellee. )

Submitted: June 17, 2021
Decided: August 12, 2021

## MEMORANDUM OPINION

*On Appeal from the Industrial Accident Board:*
**AFFIRMED**.

Andrew J. Carmine, Esquire, Elzufon Austin & Mondell, PA, 300 Delaware Avenue, Suite 1700, P.O. Box 1630, Wilmington, Delaware 19801; Attorney for Appellant Alutech United, Inc.

Heather A. Long, Esquire, Patrick C. Wenk, Esquire, Kimmel, Carter, Roman, Peltz & O'Neill, P.A., 56 W. Main Street, Newark, Delaware 19702; Attorneys for Appellee Michael Sammons.

**WHARTON, J.**

# I.    INTRODUCTION

Alutech United, Inc. ("Alutech") filed a Notice of Appeal on February 8, 2021 seeking a review of the January 19, 2021 decision by the Industrial Accident Board ("Board").  Alutech contends that the Board erred when found that Appellee Michael Sammons ("Sammons") had sustained compensable work-related injuries on September 8, 2018 and granted his Petition to Determine Compensation Due to Injured Employee.

In considering this appeal, the Court must determine whether the Board's decision is supported by substantial evidence and is free from legal error. Specifically, the Court must determine whether the Board erred in basing its findings on the testimony of Dr. James Zaslavsky, D.O. that Sammons sustained a compensable work-related injury on September 8, 2018 in view of Alutech's contention that Dr. Zaslavsky's opinion was speculative and not grounded in substantial competent evidence.  Upon consideration of the pleadings before the Court and the record below, the Court finds that the Board did not err when it credited Dr. Zaslovsky's opinion that Sammons' injuries were "… with a high degree of medical probability caused by the work-related injury on 9/9/18." Accordingly, the Board's decision is **AFFIRMED.**

2

## II.    FACTUAL AND PROCEDURAL CONTEXT

The Board's decision summarized the evidence presented in the hearing. Inasmuch as neither party contends that summary is inaccurate, the Court adopts that section of the Board's decision. On December 17, 2017, Sammons began working for Alutech at what he described as a physically demanding job.[1] He testified that on September 8, 2018, while engaged in cutting out metal in a wood section of a wall, the wall fell on him, taking him down with it and injuring his head and right shoulder.[2] He continued working that day and thereafter at the same job with Alutech.[3]

After the accident, Sammons made several trips to the emergency room without mentioning the that he was injured in an accident at work. At a December 18, 2018 visit to the emergency room, he reported a three-week history of headaches but did not complain of neck pain – his pain was focused on his shoulder blades.[4] He was back in the emergency room for chest pains on March 25, 2019.[5] On July 11, 2019, he was treated at the emergency room for low back pain, but denied any known injury or trauma.[6] His explanation for denying any

---

[1] *Michael Sammons v. Alutech United, Inc.*, No. 1500552 at 2 (Del. I.A.B. 1/21/21). D.I. 6.
[2] *Id.*
[3] *Id.* 2-3.
[4] *Id.* at 3.
[5] *Id.*
[6] *Id.*

3

work related injury was that he loved his job and had insurance to cover his expenses.[7]

On August 21, 2019, Sammons was terminated from his job at Alutech.[8] Less than two months later, on October 6, 2019, Sammons was back at the emergency room seeking treatment for back pain, headaches beginning the week prior, shoulder pain.[9] He also reported hand numbness, which he had about 2-3 months before the visit to the emergency room.[10] For this visit, Sammons directed the health care provider to bill Alutech for a workers' compensation claim.[11] After this initial claim of a work related injury, Sammons provided a workers' compensation statement on November 5, 2019 and a week later he reported pain between his shoulders from an "old workers' compensation injury."[12]

Sammons then embarked on a course of treatment related to his claim that he was injured at Alutech. On December 4, 2019 he was treated for a "workers' compensation initial visit" during which he reported that the September 8, 2018 accident caused him to experience headaches, "stabbing pain, his hands and feet going to sleep and neck and low back injuries.[13] When he sought chiropractic care

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*

on December 15, 2019, he reported the September 2018 work accident.[14]   He sought treatment for similar complaints on January 10, 2020, and again on January 15th, listing the workers' compensation carrier as the responsible party.[15]   On January 20th, he sought treatment again for worsening symptoms.[16]

On April 30, 2020, Sammons had his initial visit with Dr. James Zaslavsky, a board certified orthopedic surgeon.[17]   At that visit, Sammons complained of experiencing neck pain radiating down his arms, bilateral upper extremity radicular problems, and back, knee, hip and shoulder pain, which he associated with the 2018 work injury.[18]   Dr. Zaslavsky conducted a physical examination and reported certain abnormalities.[19]   An MRI revealed two large, herniated discs compressing nerves and causing Sammons' right arm symptoms to be worse than his left.[20]   Dr. Zaslavsky concluded that Sammons' MRI results were consistent with his September 2018 injury, which Dr. Zaslavsky reviewed on video.[21]   In May 2020, Sammons reported lumbar spine symptoms, prompting Dr. Zaslavsky to order a lumbar and cervical spine MRI to determine, in part, whether those symptoms

---

[14] *Id.*
[15] *Id.* at 4.
[16] *Id.*
[17] *Id.* at 8.
[18] *Id.*
[19] *Id.* at 9.
[20] *Id.*
[21] *Id.*

were related to Sammons neck and back radicular problems.[22]  The results of that MRI showed progressive disc worsening as a result of an increasing disc protrusion, which Dr. Zaslavsky explained is common with disc injuries over time.[23]  Dr. Zaslavsky also noted an acute annular tear with a disc protrusion through the tear, adding that such acute herniations do not normally occur absent some type of trauma.[24]  He opined that the acute findings were consistent with an injury having occurred in the 2018 accident.[25]  He found no other cause for Sammons' cervical spine injury in Sammons' treatment records.[26]  After Sammons' symptoms continued to worsen over time, he underwent a two level disc procedure on August 7, 2020.  Apparently, that surgery was successful, and Sammons' symptoms were drastically reduced, with his upper extremities and cervical spine completely pain free.[27]

Dr. Zaslavsky testified at the hearing by deposition.  In that deposition he expressed his opinions in a variety of ways, all with the understanding that his answers to the questions posed by counsel would be "within a reasonable degree of

---

[22] *Id.*
[23] *Id.* at 10.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* at 11.

6

medical probability."[28]  Dr. Zaslavsky testified that Sammons initial complaint on December 18, 2018 of a three-week history of right frontal headaches "can" be consistent with a neck injury.[29]  He testified that Sammons later complaints of "headache, shoulder pain, numbness in the hands present for some time is indicative of a neck injury, yes, it is, and a neck problem."[30]  When asked whether Sammons' complaint on December 4, 2019 of his hands and feet falling asleep "could be evidence of a spine injury," Dr. Zaslavsky answered, "Yes, it could. Absolutely."[31]  Counsel for Sammons listed Sammons' complaints in doctor visits from December 2019 to when he began seeing Dr. Zaslavsky in April 2020, which included neck and low back issues as well as headaches, pain between his shoulder blades, and his hands falling asleep.[32]  In response, Dr. Zaslavsky testified that those symptoms were, "all indicative of a neck injury and a term we notice, cervical radiculopathy.  Usually comes from one or two or more discs that are compressing the nerves that exit the cervical spine and go down the arms."[33]

---

[28] Claimant's Ex. 1, James Zaslavsky, D.O. – Deposition of November 3, 2020 at 4. (BY MS. LONG: Q. I'm gonna ask you a series of questions about your treatment and evaluation if Mike and I ask that you give your responses within a reasonable degree of medical probability.  If you are unable to answer my questions within that standard, will you just let us know. [sic]  A.  I absolutely will.)
[29] *Id.* at 5.
[30] *Id.* at 6.
[31] *Id.* at 7.
[32] *Id.* at 8-9.
[33] *Id.* at 9.

In April 2020, Sammons saw Dr. Zaslavsky who performed a physical examination on Sammons in addition to taking a history from Sammons.[34] Dr. Zaslavsky testified that MRI results were consistent with the mechanism of injury he saw on the video of the accident – "Yes, especially the C6-7 findings which do show the acute tear are compatible with an injury such as a wall falling on top of a person, injuring the cervical spine. It is feasible that the symptoms can start out mild to moderate and progressively get worse over the course of a year."[35] He explained that it is "theoretically" possible that Sammons would have been able to live with the injury from September 2018 until it progressively became worse in the beginning of 2020.[36] Additionally, Dr. Zaslavsky testified that the MRI results, particularly the "more acute protrusion especially at C6-7" is consistent with Sammons' reported injury in September 2018.[37] Dr. Zaslavsky related that a June 2020 MRI showed "progressive worsening of the disc bulges. And that is very common after you injure a disc."[38] Dr. Zaslavsky explained how disc bulges "…could start as a small protrusion. It could take a week and months for it to become a protrusion that is actually causing progressive symptoms where a patient can get concerned enough to come in for treatment, and as we get a subsequent

---

[34] *Id.* at 10-11.
[35] *Id.* at 13.
[36] *Id.*
[37] *Id.* at 14.
[38] *Id.* at 16.

8

MRI just six months later it shows those herniations are even worse at that point.[39]

According to Dr. Zaslavsky, the type of acute injury he observed on Sammons' MRI is not typically found in the absence of trauma, and was in the time frame he would expect from a September 2018 injury.[40]  In all of the extensive medical records he reviewed, Dr. Zaslavsky found nothing that could be an alternate cause of Sammons' cervical spine injury.[41]

After a discussion of Sammons' surgery, Dr. Zaslavsky was asked:

> Q.  Given those intraoperative findings as well as your ability to look at the MRIs from December of '19, June of '20 and all of Mike's medical records now, can you state within a reasonable degree of medical probability that the neck injury was caused by the wall falling on him in September 2018?

He gave the following lengthy answer:

> A.     Looking at the MRIs and the time frame at which Mike  presented, obviously many patients start to have symptoms much sooner.  Mike's symptoms started to really get bad enough to treat October of 2019 which is almost a year after his injury.
>
> It is not unfeasible that symptoms could be progressive in nature and that the start of a tear and a disc protrusion could eventually progress to the point of where it becomes symptomatic enough to seek treatment, could be a year in lapse which is in Mike's case; however, his

---

[39] *Id.*
[40] *Id.* at 16-17.
[41] *Id.* at 17.

MRI obviously shows two acute injuries in his cervical spine.

His symptoms are concordant with the injuries that we see on his MRI which are traumatic in nature. His symptoms are also progressive between the months of December of 2019 and June of 2020 which is synonymous with the progression of his MRIs in terms of the severity despite the fact that Mike is not working during those months, and overall the clinical symptoms that we see that are both objective and subjective are concordant with his MRIs.

The MRIs are explained by a work injury that we see both on video and verbally told by Mike Sammons himself and also he improves nearly completely with his surgical procedure.[42]

In shorter form, Dr. Zaslavsky expressed his opinion - "The problem he presents for is radicular symptoms from the cervical spine and two herniated discs that are with a high degree of medical probability caused by the work-related injury on 9/8/2018."[43]

In opposition to Dr. Zaslavsky, Alutech presented the testimony of Eric T. Schwartz, M.D, also a board-certified orthopedic surgeon. Dr. Schwartz' testimony also was presented to the Board by deposition. Like Dr. Zaslavsky, Dr. Schwartz reviewed Sammons' pertinent medical records and personally examined Sammons.[44] Because Alutech's appeal challenges the sufficiency of Dr.

---

[42] *Id.* at 20-21.
[43] *Id.* at 26.
[44] *Sammons* at 12.

10

Zaslavsky's opinion regarding the cause of Sammons' injuries, the Court need not discuss Dr. Schwartz' testimony in detail. It is sufficient to note that Dr. Schwartz disagrees with Dr. Zaslavsky's conclusion that Sammons' injuries are related to the accident on September 8, 2018.[45] In Dr. Schwartz' view, Sammons MRI findings were pre-existing and showed degenerative changes that were unrelated to any event, including the 2018 work accident.[46] He disagreed with Dr. Zaslavsky that Sammons' worsening symptoms occurred over time because none of those symptoms were documented for over a year.[47]

Sammons submitted a Petition to Determine Compensation Due to Injured Employee on June 24, 2020.[48] A hearing was held before the Board on November 20, 2020.[49] The Board issued its decision on January 21, 2021 finding that Sammons had proved that the injuries he sustained on September 8, 2018 were causally related to his work related activities.[50] In doing so, it relied in part on the testimony of Dr. Zaslavsky, in particular his testimony that Sammons' "radicular symptoms stemmed from two cervical spine discs and an annular tear, which are

---

[45] Alutech's Op. Br. at 11, D.I. 11.
[46] *Sammons* at 15.
[47] *Id.* at 15-16.
[48] *Id.* at 2.
[49] *Id.*
[50] *Id.* at 18.

11

"…with a high degree of medical probability cause d by the work-related injury on 9/8/2018.'"[51] This appeal followed.

## III. THE PARTIES' CONTENTIONS

Alutech contends that the Board's decision should be reversed because there was an inadequate evidentiary basis to support it. Specifically, it challenges the sufficiency of Dr. Zaslavsky's opinion that Sammons injuries were caused by the work accident on September 8, 2018. It its view, Dr. Zaslavsky's explanation of Sammons' delayed onset of symptoms was conjectural and failed to meet the requisite standard of reasonable medical probability.

In response, Sammons makes two points. First, he argues that Dr. Zaslavsky did express his causation opinion that Sammons' injuries were causally related to the work accident on September 8, 2018. Second, he argues that the totality of the evidence, including, but not limited to Dr. Zaslavsky's testimony supported the Board's decision.

## IV. STANDARD OF REVIEW

The Board's decision must be affirmed so long as it is supported by substantial evidence and is free from legal error.[52] Substantial evidence is that

---

[51] *Id.* at 20.
[52] *Conagra/Pilgrim's Pride, Inc. v. Green*, 2008 WL 2429113, at *2 (Del. June 17, 2008).

which a reasonable mind might accept as adequate to support a conclusion.[53] While a preponderance of evidence is not necessary, substantial evidence means "more than a mere scintilla."[54] Questions of law are reviewed *de novo*,[55] but because the Court does not weigh evidence, determine questions of credibility, or make its own factual findings,[56] it must uphold the decision of the Board unless the Court finds that the Board's decision "exceeds the bounds of reason given the circumstances."[57]

## V. DISCUSSION

In Delaware, an employee is entitled to receive benefits pursuant to the workers' compensation statute for injuries or death "arising out of and in the course of employment,"[58] but only:

---

[53] *Kelley v. Perdue Farms*, 123 A.3d 150, 153 (Del. Super. 2015) (citing *Person-Gaines v. Pepco Holdings, Inc.*, 981 A.2d 1159, 1161 (Del. 2009)).

[54] *Breeding v. Contractors-One-Inc.*, 549 A.2d 1102, 1104 (Del. 1988).

[55] *Kelley*, 123 A.3d at 152–53 (citing *Vincent v. E. Shore Markets*, 970 A.2d 160, 163 (Del. 2009)).

[56] *Bullock v. K-Mart Corp.*, 1995 WL 339025, at *2 (Del. Super. May 5, 1995) (citing *Johnson v. Chrysler Corp.*, 213 A.2d 64, 66–67 (Del. 1965)).

[57] *Bromwell v. Chrysler LLC*, 2010 WL 4513086, at *3 (Del. Super. Oct. 28, 2010) (quoting *Bolden v. Kraft Foods*, 2005 WL 3526324, at *3 (Del. Dec. 21, 2005)).

[58] 19 *Del. C.* § 2304 ("Except as expressly excluded in this chapter and except as to uninsured motorist benefits, underinsured motorist benefits, and personal injury protection benefits, every employer and employee, adult and minor, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies."). *See also Histed v. E.I. Du Pont de Nemours & Co.*, 621 A.2d 340, 342 (Del. 1993) ("Under the Act every employee is bound to accept compensation for personal

while the employee is engaged in, on or about the premises where the employee's services are being performed, which are occupied by, or under the control of, the employer (the employee's presence being required by the nature of the employee's employment), or while the employee is engaged elsewhere in or about the employer's business where the employee's services require the employee's presence as a part of such service at the time of the injury . . . .[59]

At issue before the Board was whether the accident on September 8, 2018 caused the injuries for which Sammons was seeking to be compensated through workers' compensation. Based primarily, but not exclusively, on the testimony of Dr. Zaslavsky, the Board found that he was entitled to workers' compensation benefits. The issue before the Court is whether the opinions expressed in Dr. Zaslavsky's testimony upon which the Board relied met the medical expert opinion standard of reasonable degree of medical probability. They did.

There is no real dispute about the applicable law. The parties agree that the Board's decision must be supported by substantial evidence. They also agree that where medical testimony is necessary to support a causal relationship between an injury and a work-related accident, testimony evincing only a possibility of that relationship is insufficient. Expert medical testimony necessary to support that

---

injury caused by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.").

[59] 19 *Del. C.* § 2301(19)(a).

14

causal relationship must be expressed to a reasonable degree of medical probability.

At various times in his testimony, Dr. Zaslavsky used terms such as "can be," "could be," "feasible," "theoretically," and "not unfeasible." It is equivocal terms such as these that Alutech argues support its contention that Dr. Zaslavsky's testimony was speculative. An important, if not the most important, point of contention between the parties before the Board was the latency of the symptoms Sammons claimed were attributable to the work accident. In Dr. Schwartz' opinion this late manifestation of symptoms precluded a causal relationship between Sammons' medical issues and the work accident of September 8th.

Dr. Zaslavsky's contested, equivocal testimony must be viewed in its proper context. It was not his ultimate opinion on causation. That opinion was clearly stated on direct examination – "The problem he presents for is radicular symptoms from the cervical spine and two herniated discs that are with a high degree of medical probability caused by the work-related injury on 9/8/18."[60] He stated it again on cross-examination when asked how he came to his conclusion that Sammons' injuries were work related – "I come to that conclusion with reasonable degree of medical probability because of the fact that I saw a video of a wall collapse on top of [Sammons]. I understand the physiology of an injury to the

---

[60] Claimants Exhibit 1, James Zaslavsky, D.O. – Deposition of November 3, 2020 at 26.

15

cervical spine and the symptoms that can come on gradually over time."[61]   The Board found that testimony convincing.[62]  The challenged testimony implicitly was offered in opposition to Dr. Schwartz' contention that Sammons' delayed reporting of his symptoms precluded a causal connection between Sammons' injuries and the accident.  Dr. Zaslavsky was denying that preclusive effect.  In other words, he was saying that, to a reasonable degree of medical probability,[63] it is possible, and not impossible as Dr. Schwartz contends, to have symptoms that manifest themselves gradually.

The Court's role on appeal is not to re-weigh the evidence and decide whether the Board reached the correct decision.  Instead, it is to decide whether there was substantial evince to support the Board's decision and whether that decision was free from legal error.  Dr. Zaslavsky's ultimate causation opinion, expressed to a reasonable degree of medical probability at least twice, was substantial evidence of causation such that a reasonable mind might accept it as adequate to support the Board's conclusion.  Thus, the Court concludes that the Board's decision was supported by substantial evidence and was free from legal error.

---

[61] *Id.* at 36.
[62] *Sammons* at 20.
[63] At the outset of his testimony, Dr. Zaslavsky agreed to express his opinions to within a reasonable degree of medical probability.  *See* n. 28.

16

## VI. CONCLUSION

For the foregoing reasons, the Board's decision is **AFFIRMED.**


**IT IS SO ORDERED.**


/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.